AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
1/21/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____KM_____ DEPTUY

**FILED**
CLERK, U.S. DISTRICT COURT
January 21, 2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____CLD_____ DEPUTY

| | |
|---|---|
| United States of America,<br>Plaintiff,<br><br>v.<br><br>ALEXANDER SOOFER,<br><br>Defendant. | Case No. 2:26-MJ-00317 |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about June 21, 2024 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*FBI Special Agent Casey Tilton*
_____
*Complainant's signature*

Casey Tilton, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  January 21, 2026 _____     _____
*Judge's signature*

City and state:  Los Angeles, California _____     Hon. Alka Sagar, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Kerry L. Quinn (x5423)

## <u>AFFIDAVIT</u>

I, CASEY TILTON, being duly sworn, declare and state as follows:

### I.  <u>INTRODUCTION</u>

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since April 11, 2021.  I am currently assigned to the Public Corruption Squad of the Los Angeles Division in the Central District of California and have been since August 2021.  During my career as an FBI SA, I have participated in numerous criminal investigations, and I have received both formal and informal training, regarding bribery, embezzlement, money laundering, honest services mail and wire fraud, and related conspiracies.  My training has also included the use of multiple investigative methods including 18 U.S.C. § 2703 search warrants, and I am knowledgeable about the types of records stored and services provided by internet service providers.  Prior to my work as an FBI agent, I received a master's degree in business administration with a focus on finance and business strategy.

2.    I am submitting this affidavit in support of a complaint and arrest warrant for ALEXANDER SOOFER for a violation of 18 U.S.C. § 1343 (wire fraud).

3.    I am working on this investigation with other federal agents including SA Khalin Chand of the Internal Revenue Service – Criminal Investigative Division ("IRS-CI").  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested

warrants and does not purport to set forth all of my knowledge
of or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only.

## II. SUMMARY OF PROBABLE CAUSE

4.    A joint investigation of the FBI and IRS-CI has
revealed probable cause to believe ALEXANDER SOOFER engaged in a
years-long scheme to defraud the City and County of Los Angeles
and other public entities providing funding for homeless
housing, through programs administered by the Los Angeles
Homeless Services Authority ("LAHSA").  For years SOOFER used
the money from these programs as his own personal piggybank to
bankroll a lavish lifestyle that included luxury improvements on
a $7 million house in Westwood, $475,000 for (what appears to
be) a vacation property in Greece, private schooling for his
children, lavish spending in Las Vegas, private jet travel, and
stays at luxury resorts across the United States – from Maui to
Palm Beach.  The victims include the public entities and
taxpayers that funded these programs, as well the vulnerable
individuals the programs were designed to serve, as SOOFER
failed to shelter and feed the individuals he was responsible
for housing while he lived in luxury with public money that was
supposed to be used to help them.

5.    In the course of the scheme, SOOFER lied about many
things.  Among his many lies and misrepresentations were the
false representations he made in contracts with LAHSA that the
money he obtained from LAHSA would be used for homeless housing
(and exclusively for homeless housing), when he instead used

this money for his own personal enrichment and to fund unrelated businesses. SOOFER also lied about payments supposedly being made to third party vendors for homeless housing services. That is, SOOFER took steps to make it appear he was making millions of dollars in payments to vendors for services provided to participants at homeless housing sites, when he was instead diverting these payments to his own bank accounts and misappropriating the money for himself. He further lied about rent payments being made for properties he was supposed to be using for homeless housing, making it falsely appear that he was leasing these properties from third-party landlords at a market rate, when he was instead paying himself above-market-rate rent and again misappropriating money that could have been used to help alleviate the homeless housing crisis. To cover up the fraud, SOOFER fabricated fake and misleading invoices -- at times stealing the names, addresses, and logos of real companies -- to make it appear that the vendor and rent payments were legitimate. In this way, SOOFER misappropriated more than $8 million in public funding.

6.    Not only did SOOFER steal millions of dollars in public funds that should have been used for homeless housing, he failed to appropriately shelter and feed the homeless housing participants at his sites. After receiving hotline complaints and seeing anomalies in SOOFER's billing and services, LAHSA and Los Angeles city investigators conducted site visits at some of SOOFER's sites and found the only food items being served at these sites were things like Ramen noodles, canned beans, and

breakfast bars – which was in contrast to the three-meal-a-day commitment SOOFER had made and the City had paid for.

7.    When a LAHSA investigator asked SOOFER if his board knew how he was spending money, he said they did, but the board, it turns out, was fake.  The investigator tried to contact the board members SOOFER listed on his website and in materials submitted to LAHSA, and she found the people either did not exist or had never heard of Abundant Blessings.

8.    The scheme involved numerous interstate wires and losses are currently estimated at over $10 million -- the $8 million referenced above and additional amounts under investigation.  In total, SOOFER received more than $23 million in homeless housing funding between 2018 and 2025.  Of that, $5 million came directly from LAHSA and more than $17 million came through another non-profit called Special Service for Groups Inc. ("SSG"), which received its funding from LAHSA.

### III.  STATEMENT OF PROBABLE CAUSE

**A.    SOOFER and Abundant Blessings Contracted with LAHSA to Provide Services to the Homeless**

9.    On November 7, 2025, and January 9, 2026, federal investigators interviewed M.G., the Director of Grants Management and Compliance for LAHSA.  I have reviewed reports of these interviews, and I virtually attended the second interview. I have also reviewed documents produced by LAHSA, and I have separately spoken to other agents who attended these interviews and reviewed LAHSA productions.  From these sources, I know the following:

a.    SOOFER was the owner of Abundant Blessings, Inc. and Abundant Blessings from Above, Inc. (collectively, "Abundant Blessings"), which he collectively operated as a homeless housing services provider.  He also served as the organization's Chief Executive Officer, Chief Financial Officer, and other executive functions.  As Abundant Blessings's owner and executive, he signed all contracts with LAHSA on Abundant Blessings's behalf.  Whenever LAHSA conducted monitoring of Abundant Blessings or had any questions for them, they spoke to SOOFER.

b.    Through Abundant Blessings, SOOFER contracted with LAHSA to provide housing for people experiencing homelessness or at risk of experiencing homelessness.

c.    SOOFER's commitments to LAHSA date back to at least 2018.  At first, SOOFER received homeless funding through SSG, which received its funding from LAHSA, but SOOFER began to contract directly with LAHSA starting no later than 2021.  After that, SOOFER received money from both LAHSA directly and indirectly from LAHSA through SSG.

d.    By 2022, SOOFER had multiple contracts with LAHSA to provide housing and supportive services to more than 100 participants at multiple sites across south Los Angeles.  By July 2023, SOOFER's commitments had expanded to more than 600 participants, again at multiple sites across south Los Angeles.

e.    In some contracts, SOOFER committed to house participants at sites he managed.  In other contracts, SOOFER committed to pay third parties, including hotels or motels, to provide this housing.  The properties where SOOFER was supposed

to house participants included properties on Ardmore Avenue, West 48th Street, West View Street, and Vermont Avenue, as well as hotels and motels that included the Antonio Hotel, Starlite Inn Motel, and the Remi.

      f.   Regardless of whether participants were in sites SOOFER managed directly or indirectly, SOOFER committed to providing homeless program participants with three meals a day, which the contracts defined as meals that were healthy, balanced, and met participants' nutritional needs.

**B.   LAHSA Finds Evidence of SOOFER's Fraud in its Monitoring and Investigations of Abundant Blessings**

10.   According to information provided by M.G. and other documents and information provided by LAHSA:

      a.   In 2024, during LAHSA's yearly monitoring of Abundant Blessings as a grant recipient, LAHSA discovered anomalies in services being provided and payments SOOFER was receiving for those services.  Further examinations of those irregularities revealed evidence of fraud.

      b.   As part of the 2024 monitoring, LAHSA selected a sample of contracts for the 2023-2024 fiscal year and requested backup documentation on a subset of the payment requests Abundant Blessings had submitted under these contracts.  LAHSA also sought backup documentation for a sample of personnel files, participant information, and other information relevant to the services Abundant Blessings was supposed to be providing. LAHSA personnel met with SOOFER and at least one other Abundant Blessings employee and they conducted multiple site visits.

c.    It quickly became clear to LAHSA personnel that SOOFER had been billing for expenses that were not allowed under his contracts.  The improperly billed expenses included hundreds of thousands of dollars (or more) in construction costs, when construction was not something SOOFER had contracted with LAHSA to provide.  These expenses also included things like car payments, staff meals, Uber trips, and other questionable expenses.

d.    When confronted with the improper expenditures, SOOFER claimed he must have provided the wrong documentation because he would not have billed LAHSA for those expenses.  He then said he would re-classify expenses in his general ledger and re-submit the required documentation to LAHSA.

e.    LAHSA gave SOOFER the opportunity to re-classify and re-submit expenses.  But even after this months-long process was complete, the general ledger did not make sense and it still appeared SOOFER had billed for improper expenses.  It also appeared like at least some of the invoices SOOFER submitted as supposed backup for billed-for services were fabricated.

f.    For example, LAHSA did some additional checking and found that the catering vendor listed on certain invoices, Revolution Kitchen, had never done business with Abundant Blessings or SOOFER.  LAHSA monitors also investigated and visited the address listed on invoices SOOFER had submitted supposedly from Revolution Kitchen.  The address was associated with a different catering business, Amped Kitchen, that had also never heard of Abundant Blessings or SOOFER.

g.    LAHSA conducted unannounced site visits at sites where SOOFER was supposed to be housing and feeding participants.  When the monitoring team arrived at lunch hour at one site, lunch was not being provided.  After being questioned about this, SOOFER ran to a McDonald's fast-food restaurant and came back with bags of food to give participants for lunch.

h.    Records of other site visits at SOOFER's sites similarly showed participants were not being provided required meals.  Monitors would see things like Ramen noodles and canned beans at the sites, but no prepared meals, fresh or otherwise, even though SOOFER had committed to provide these meals in his contracts with LAHSA.

i.    The monitoring team asked SOOFER if his board knew how he was spending his money, and he said they did. But when M.G. tried to get in touch with the board members listed on Abundant Blessings's website and in the materials submitted to LAHSA, she found that some individuals did not exist and others had never heard of Abundant Blessings.[1]

j.    In addition to all the other problems, one of the hotels where SOOFER was supposed to have been housing participants, the Remi, was not being paid, even though LAHSA had paid Abundant Blessings to house participants at this hotel. The hotel was threatening to evict the participants due to lack of payment.  To avoid this, LAHSA paid the hotel directly.

---

[1] Agents have identified one individual listed as an Abundant Blessings board member that does appear to be related to SOOFER, but this individual has not been contacted.

k.   As a result of this and the other findings of fraud, LAHSA terminated its contracts with Abundant Blessings and moved participants to other sites.  The matter was referred to the Los Angeles District Attorney's Office for criminal prosecution.

**C.   LA City Investigation Reveals Fraud by SOOFER**

11.  On December 30, 2025, federal investigators interviewed A.Ar., Chief Internal Auditor for the City's Office of the Controller (the "Controller").  During the interview, agents learned the following:

a.   In approximately July 2024, the Controller received a hotline complaint alleging Abundant Blessings was not appropriately housing and feeding participants being housed at the Antonio hotel and Starlite motel, which were sites being used to house homeless participants as part of the City's "Inside Safe" program.

b.   The Controller initiated an investigation.  As part of this, the Controller, along with LAHSA, conducted site visits and found meals were not being served as required and instead the only food items at these sites were things like Ramen noodles, cans of beans, and breakfast bars.

c.   Investigators from the Controller's office (like LAHSA monitors) also reported that, during a surprise site visit where lunch that was supposed to be served but was not being served, SOOFER was present and ran to a nearby McDonald's and bought lunch for the participants.

d.   The Controller's team also visited Abundant Blessings's headquarters and sought information related to

billing and contracted-for services.  Among other things, the
Controller's team sought billing records and backup for payment
requests Abundant Blessings had submitted to LAHSA.  In
response, staff for Abundant Blessings provided supposed
invoices from vendors related to these payment requests, and the
Controller found evidence that at least some of these invoices
were fake.

        i.  For example, the documents included invoices
supposedly from "Revolution Kitchen," but the address listed on
these invoices did not correspond to a company of that name.

        ii.  The Controller's team also found invoices
supposedly from "Armed Elite Services" that were later
determined to be fake through correspondence with the owner of
that company.

        e.  In the middle of the investigation, Abundant
Blessings did in fact start to provide meals at the Starlite and
Antonio hotels.  But in part because of the investigation, and
its findings of fraud, LAHSA terminated its contracts with
Abundant Blessings, and the matter was referred to the Los
Angeles District Attorney's Office.

    **D.  SOOFER Defrauded LAHSA Through Misleadingly Disguised
Vendor and Landlord Payments**

        1.  <u>Misleadingly Disguised Vendor Payments</u>

    12.  From a review of bank documents, LAHSA records, and
interviews with purported vendors, it appears one aspect of
SOOFER's fraud involved fake vendor payments – that is, payments
disguised to look like they were being made to third-party
vendors for homeless housing services – as a means of diverting

homeless housing funds to SOOFER's own accounts for his personal use. SOOFER also used these fake vendor payments to inflate reimbursement requests to LAHSA, and in this way, he obtained millions of dollars of public money for homeless services that Abundant Blessings did not provide.

13. Agents have obtained bank records from First Republic Bank ("First Republic") and J.P. Morgan Chase N.A. ("JPMC"), among other banks, including records for accounts SOOFER maintained in the name of Abundant Blessings (specifically Abundant Blessings, Inc. and Abundant Blessings from Above, Inc.) at First Republic and JPMC. According to those records:

a. SOOFER was the sole signatory on accounts maintained in the name of Abundant Blessings.

b. Between 2018 and 2023, at least $23 million in payments that originated from LAHSA (directly or indirectly) were made into Abundant Blessings accounts.

c. The payments varied in amount, but they often totaled $50,000 or more.

d. Both before and after the accounts received those transfers, checks were issued from these accounts (in the name of Abundant Blessings) to companies identified as vendors in submissions to LAHSA.

e. The vendors to whom checks were issued included Revolution Kitchen, Armed Elite Services, Jetro Cash and Carry, and Catering Systems, among others. As discussed below, agents have interviewed representatives of these vendors, and the representatives reported they either never worked with Abundant

Blessings or did not receive at least some of the payments that Abundant Blessings indicated had been sent to the vendors.

14.    Agents also obtained bank records for an account at JPMC maintained in the name of one of SOOFER's other businesses, Franklin Lincoln Construction, Inc. ("FLC"), with an account number ending x6272 (the "FLC Account"). According to these records:

a.    SOOFER was the sole signatory on the FLC Account.

b.    A significant number of the vendor checks referenced above were deposited into the FLC Account.

c.    Among these were checks made out to Revolution Kitchen, Armed Elite Services, Jetro Cash and Carry, and Catering Systems, among others.

d.    Signature cards for the FLC Account showed that, before the checks were deposited, SOOFER changed the name of the FLC Account to include these vendor names as "DBAs" of FLC (i.e., "doing business as," a name that an entity uses for its public-facing business activities).

e.    SOOFER's signature was on each signature card adding each of the additional DBAs, and I know from my training and experience that JPMC would have verified SOOFER's identity in connection with these account changes.

f.    On April 4, 2023, SOOFER changed the name of the account to include "DBA Armed Elite Services."

g.    On November 1, 2023, SOOFER changed the name of the account to include "DBA Revolution Kitchen."

h.    On December 12, 2023, SOOFER changed the name of the account to include "DBA Jetro Carry 1."

i.    On August 6, 2024, SOOFER changed the name of the account to include "DBA Catering Systems."

j.    Additional DBAs that SOOFER listed on this account include "La Piana Consulting," "Core Services," "Utah Group," "Universal Furniture and Mattress," "Brighton Construction," "Batz CCTV," and "Wilshire Real Estate Services."

k.    After SOOFER added the DBAs, millions of dollars in checks made out to these supposed Abundant Blessings vendors were deposited into the FLC Account.  For example:

i.    53 checks from Abundant Blessings made out to Armed Elite Services were deposited into the FLC account for a total amount of $791,195.

ii.   22 checks from Abundant Blessings made out to Revolution Kitchen were deposited into the FLC account for a total amount of $382,774.50.

iii.  Seven checks from Abundant Blessings made out to Jetro Cash and Carry were deposited into the FLC account for a total amount of $126,797.72.

iv.   Two checks to Catering Systems from Abundant Blessings were deposited into the FLC Account, including: an August 15, 2024, check for $30,039; and a September 15, 2024 check for $34,751.

l.    Additional checks from Abundant Blessings were made out to the other DBAs listed in the account name and deposited into the FLC account.

m.    After the checks were deposited in the FLC Account, SOOFER used the funds for his personal expenses and business expenses unrelated to homeless housing.

n.    For example, the FLC Account was used to make more than $3 million in payments to SOOFER's credit card with American Express ("AmEx") ending in x4002, which SOOFER used largely for personal expenses.  Among the large payments SOOFER made to his AmEx account from the FLC Account are the following:

i.    A $150,000 payment on August 23, 2023;

ii.    A $141,008.90 payment on February 2, 2024; and

iii. A $139,288.10 payment on April 16, 2024.

15.  Records from LAHSA also indicate the following:

a.    Numerous reimbursement requests submitted to LAHSA for Abundant Blessings included requests for reimbursement of the vendor payments described above, with specific line items indicating the payments had been made for things like catering, consulting, or security, supposedly for services that Abundant Blessings was providing to homeless housing participants or using as part of its work in providing services to these participants.  SOOFER's name is listed on LAHSA reimbursement requests as the person at Abundant Blessings with "Primary Financial Responsibility," and the person who approved all the submissions.

b.    In connection with the monitoring and investigations described above, purported backup documents were submitted to LAHSA to try to justify the reimbursement requests for some of these payments.  These backup documents included invoices supposedly sent from the vendors to Abundant Blessings seeking payment for listed services.  LAHSA, City, and federal investigators later determined many of these invoices appeared

fabricated for the reasons discussed in this affidavit. Additional documents submitted to LAHSA such as purported proposals and contracts were also determined to be fake. Interviews with these vendors are discussed below.

16. Although many of the fake vendor payments are associated with the names of real companies whose names and sometimes even company logos were used as part of the fraud, it also appears that fraudulent vendor payments were made to SOOFER-controlled companies or DBAs of those companies for services that were not provided, not allowable expenses, or that were otherwise misrepresented.

a. For example, SOOFER submitted requests for reimbursement for building maintenance services supposedly being provided by "Wilshire Real Estate Services." SOOFER did not disclose that this was, in fact, his company and, instead, took steps to make it appear in invoices that this company was a third-party service provider. Other circumstances indicate the services supposedly provided by Wilshire Real Estate Services were never provided. For example, the billed-for services included supposed landscaping at motels that would have provided their own landscaping.

b. SOOFER also submitted for (and LAHSA paid him for) more than $1 million in construction services through his affiliate company FLC, even though construction was never something SOOFER had contracted with LAHSA to do.

2. Misleadingly Disguised Landlord Payments

17. Similarly, SOOFER submitted for (and LAHSA paid him for) millions of dollars of rental payments made to companies

SOOFER controlled, but he disguised the payments to make it appear as though the companies were controlled by third parties. In this way, SOOFER violated contractual commitments he made to LAHSA (and state law) to avoid undisclosed conflicts of interest, and he also avoided the scrutiny LAHSA would have otherwise given to these payments to ensure they were market rate, which they were not.

18.  By way of example, according to bank documents and LAHSA records:

a.  More than $540,000 in checks were issued from the Abundant Blessings bank accounts to "Ardmore Avenue Rentals," and these checks were deposited into another account that SOOFER controlled (SOOFER listed this name as a DBA on the account). These payments were submitted to LAHSA for reimbursement for housing SOOFER was supposedly providing to participants at 1135 S. Ardmore Avenue, Los Angeles, California 90006 (the "Ardmore Avenue property").

b.  But according to LAHSA, SOOFER never disclosed he owned the Ardmore Avenue property and was paying himself rent. If he had, it would have triggered additional scrutiny of the lease agreement to ensure the monthly rent represented a market rate for the property.

c.  Instead, SOOFER provided LAHSA with a misleading lease agreement making it appear that the Ardmore Avenue property was owned by a third-party company named "Ardmore Avenue Rentals," owned and managed by a different person.

d.  That is, SOOFER signed the lease agreement for the Ardmore Avenue property on behalf of Abundant Blessings as

tenant, but the supposed "Owner/Manager" of the landlord "Ardmore Avenue Rentals" was someone with the initials L.S. Invoices submitted to LAHSA supposedly from this company also made it appear like the company was a third-party company, located at a commercial address in Beverly Hills that appeared to have no affiliation with Abundant Blessings.

   e. According to public records, SOOFER owned the Ardmore Avenue property himself through an affiliate company called Prosperity Ventures No 1, LLC.  Bank documents confirm SOOFER was receiving the rent payments Abundant Blessings was making to Ardmore Avenue Rentals for this property.

   f. Similarly, more than $1.5 million in checks were issued from Abundant Blessings Bank accounts to "2412 W 48th Street Properties," and SOOFER submitted reimbursement requests to LAHSA for payments Abundant Blessings supposedly made to 2412 W 48th Street Properties" for property being leased at 2412 W. 48th Street, Los Angeles, California 90006 (the "48th Street property"). But again, SOOFER never disclosed to LAHSA that he owned this property and was paying himself rent.  Instead, he provided a misleading lease agreement making it appear the property was owned by a third-party company owned and controlled by someone with the initials C.T., and invoices submitted to LAHSA supposedly from this company made it appear like the company was a third-party company located at a commercial address with no apparent affiliation to Abundant Blessings.

   g. According to bank documents, SOOFER submitted a mortgage application for a loan on the 48th Street property, and in this application, SOOFER represented that he had a lease

agreement with a tenant for more than double the market rate on this property – which (in my training and experience) would support SOOFER's application for a loan on this property, as the rental income would be a source of repayment and collateral for the loan. SOOFER made this representation in the loan application even though the lease agreement he submitted to LAHSA represented the tenant was paying market rate.

h.    It appears SOOFER also did not disclose to the lender that his company was the tenant that had agreed to pay above market rate or that he would be paying this rent with public money obtained from LAHSA through false and misleading representations.

i.    Further, the lease agreement SOOFER submitted to the lender is fundamentally inconsistent with the lease agreement he submitted to LAHSA. Specifically, the lease agreement submitted to the lender indicated the property was being leased to Abundant Blessings from Above, Inc. for a term beginning in 2019 and continuing until 2024, with two five-year options. The lease submitted to LAHSA, however, indicated the property was being leased to Abundant Blessings Inc. for a term beginning in 2021 and continuing until 2026, with one five-year option, among other differences.

j.    I am aware of other examples of companies listed as landlords in lease agreements provided to LAHSA for Abundant Blessings sites making it appear the companies were third party companies unaffiliated with SOOFER. Related invoices submitted to LAHSA also made it appear the companies were third-party companies, when, in fact, SOOFER controlled these entities and

received all the money Abundant Blessings paid to these entities for rent.  The associated addresses include 2155 S. West View Street, Los Angeles, CA 90016, and 7900 S. Vermont Avenue, Los Angeles, CA 90044.

19.  Agents have identified at least: (a) $3 million in fake or misleading vendor checks that SOOFER misappropriated; and (b) at least $5 million in fake or misleading landlord checks that SOOFER misappropriated – all of which were checks issued by Abundant Blessings, deposited into the FLC Account or another SOOFER-controlled bank account, and, following these deposits, SOOFER spent most of these funds on personal expenses or business expenses unrelated to homeless housing.

20.  Agents are also investigating more than $1 million in additional checks drawn on Abundant Blessings accounts made out to SOOFER, and more than $1,000,000 in wire transfers from Abundant Blessings accounts to SOOFER's criminal counsel – after LAHSA started investigating.

**E.  Interviews of Vendors Whose Names Were Used in the Fraud**

21.  Federal investigators have interviewed some of the companies that purportedly provided the services listed on reimbursement requests SOOFER submitted to LAHSA and whose names were also used in supporting invoices and contractual agreements submitted by SOOFER to LAHSA.

1.  <u>Revolution Kitchen</u>

22.  On January 7, 2026, federal investigators interviewed N.B., the owner of Revolution Kitchen, and his wife.  N.B. appeared to have limited English skills, but his wife, who spoke

fluent English, was also familiar with the operation of the
business.  During that interview, agents learned the following:

a.   Revolution Kitchen was a catering company, but it
never did business with Abundant Blessings.

b.   Revolution Kitchen operated under a different
corporate entity called Cook Unity, also using the name
Revolution Kitchen, which was also the corporate name listed
with the California Secretary of State.

c.   During the interview, agents showed N.B. and his
wife invoices SOOFER submitted to LAHSA purportedly from
Revolution Kitchen.  N.B. and his wife confirmed that the
invoices were not authentic invoices of Revolution Kitchen.  The
address listed for Revolution Kitchen was not the correct
address for Revolution Kitchen.  N.B. and his wife also said
they did not use an invoicing process for Revolution Kitchen
services and did all their billing through Cook Unity.

d.   N.B. and his wife also confirmed that the
contract SOOFER submitted to LAHSA purportedly between
Revolution Kitchen and Abundant Blessings was not an authentic
contract of the business.  They had never heard of the person
listed on the contract as the signatory for Revolution Kitchen.

e.   Furthermore, N.B. and his wife stated that the
document submitted to LAHSA titled "PROPOSAL FOR MEAL SERVICES
FOR ABUNDANT BLESSINGS, INC.," which purported to be prepared
and sent from Revolution Kitchen, was also not an authentic
document of the company.  They did not serve the food that was
listed on the sample menus, and the proposed prices of each of
the meals – $10 per breakfast, $10 per lunch, and $15.50 per

dinner – were substantially more than they would charge for meals they prepared.  And they did not serve breakfast at all.

    2.   Amped Kitchen

23.  On December 17, 2025, federal investigators interviewed J.B., Community Specialist of Amped Kitchen, and J.S., Amped Kitchen's Director of Operations.  During the interview, agents learned the following:

    a.   Amped Kitchen was a catering company located at the purported address listed for Revolution Kitchen in paperwork submitted to LAHSA.

    b.   Amped Kitchen had never done business with Revolution Kitchen or Abundant Blessings.

    c.   The invoices submitted to LAHSA purportedly for Revolution Kitchen were also not authentic invoices of Amped Kitchen.

    3.   Armed Elite Services

24.  On December 17, 2025, federal investigators interviewed T.B., the owner of Armed Elite Services.[2]  During the interview, agents learned the following:

    a.   Armed Elite Services provides security services for companies and organizations including those that operate homeless housing.

    b.   Armed Elite Services did provide some security services for Abundant Blessings, liaising with SOOFER about

---

[2] Agents are in the process of running criminal history reports for all of the witnesses interviewed thus far including witnesses whose interviews are summarized in this affidavit. Thus far, T.B. is the only witness that has come back with a criminal history, but none of T.B.'s identified convictions relate to crimes of dishonesty.

these services.  But the total cost of the services did not come close to the amount SOOFER submitted to LAHSA for reimbursement.

c.   At least some of the invoices SOOFER submitted to LAHSA supposedly from Armed Elite Services were fabricated. That is, they used the name, logo, and address of Armed Elite Services, but they were not authentic invoices from the company.

4.   Jetro Cash and Carry

25.   On December 17, 2025, federal investigators interviewed E.E., Assistant Branch Manager, and G.A., Branch Manager, of Jetro Cash and Carry.  During that interview, agents learned the following:

a.   Jetro Cash and Carry is a wholesale grocer and restaurant supply depot.

b.   SOOFER has an account with Jetro Cash and Carry, but the account is for a Yogurtland business SOOFER operates in Santa Monica, not Abundant Blessings.

c.   Jetro Cash and Carry has never done business with Abundant Blessings.

d.   At least some of the invoices submitted to LAHSA supposedly for purchases Abundant Blessings had made at Jetro Cash and Carry were not legitimate invoices of the business.

e.   The invoices shown to the witnesses included Jetro Cash and Carry's real logo, address, and phone number and the format was also consistent with the company's real invoices. But the invoices were not genuine invoices.

5.    Catering Systems

26.    On January 7, 2026, federal agents interviewed L.D., the owner of Catering Systems Inc. ("Catering Systems").  During the interview, agents learned the following:

a.    Catering Systems is a catering company that did some business with Abundant Blessings.  SOOFER acted as Abundant Blessings's representative in discussions with Catering Systems.

b.    Catering Systems started doing business with Abundant Blessings in approximately 2022, but on a limited scale, continuing until approximately August 2024.

c.    A contract submitted to LAHSA supposedly from "Catering Systems" was a real contract that L.D. executed with SOOFER and Abundant Blessings.

d.    But an earlier proposal – dated May 1, 2023 – supposedly from "Catering Systems" was not a genuine document. The logo was not the one the company used, and the document was not something Catering Systems created or issued.

e.    The sample menu items listed on the document were not meals Catering Systems provided to customers – e.g., they did not serve food called "Steamed Tilapia and Rice Breakfast," "Shrimp Linguini Breakfast," or "Mustard & Crusted Chicken Breakfast."  The amounts listed for each of the meals – $16 for breakfast, $16 for lunch, and $20 for dinner – were also far higher than what Catering Systems charged for meals.

f.    An invoice submitted to LAHSA supposedly from Catering Systems was a real invoice Catering Systems sent to Abundant Blessings.  I know from a review of this invoice and other invoices submitted to LAHSA that the format of this

genuine invoice is similar to the format of other fabricated
invoices supposedly from other companies, including invoices
supposedly from "Revolution Kitchen."  Based on this similarity
in format, I believe that SOOFER may have used Catering Systems'
genuine invoice as a template for his fabricated invoices that
he submitted to LAHSA.

       g.   I know from a review of financial records and
conversations with another agent that has reviewed financial
records that checks issued from Abundant Blessings to "Catering
Systems" were deposited into the FLC Account, which, as
discussed above, is another SOOFER-controlled bank account.
Agents showed L.D. some of these checks, and he reported he
would need to check his records to see if he received checks in
the listed amounts, but he said he never received any payments
for more than $15,000 from Abundant Blessings, so checks in
amounts greater than that – of which there were two – would not
have gone to him.

**F.    A Former Insider Confirmed SOOFER Managed Finances and
LAHSA Billing for Abundant Blessings**

      27.  On January 9, 2026, federal investigators interviewed
I.F. at the Federal Public Defender's Office in Los Angeles
("FPD").  Also present was I.F.'s attorney, a Deputy Federal
Public Defender.  The interview was conducted pursuant to a
proffer agreement, which provides for a limited form of use
immunity.  I was present for the interview and have spoken with
other investigators who were also present.  The interview was
recorded.  I.F. is from the Philippines and her native language
is Tagalog, so a Tagalog translator was present for the

interview and translated some of the interview from English to Tagalog and back.  From these sources, I know the following:

a.   SOOFER hired I.F. in approximately October 2023 to serve as the bookkeeper for Abundant Blessings.

b.   SOOFER ran Abundant Blessings, and he supervised and trained I.F.

c.   I.F. had been working with a staffing agency to find work, and she found the job through that agency.

d.   I.F. was present in the United States on a student visa, and she was not allowed to work on that visa, or her ability to work was extremely limited.  As a result, SOOFER agreed to pay I.F. in part in cash to avoid needing to report the income to government authorities (and in part to avoid needing to pay the staffing agency any fees).

e.   As part of their arrangement, SOOFER agreed to try to sponsor I.F. for a more permanent work visa, and he did take steps to do this, but as of the date of the interview, I.F. was still present in the United States on a student visa.

f.   Among I.F.'s responsibilities in her work for SOOFER and Abundant Blessings was issuing checks to landlords and vendors.

g.   I.F. issued these checks according to invoices she received from the landlords and vendors.

h.   I.F. remembered issuing checks to Ardmore Avenue Rentals and Vermont Corners, among other landlords.

i.   I.F. was not aware that SOOFER was affiliated with these companies.  To the contrary, she believed they were independent third-party companies, and she would be very

surprised if they were his companies and thought it was not even possible because she remembered seeing the backs of some of the checks that had cleared out of the Abundant Blessings bank account (she was not a signer on the account but had access to the account), and the back of the landlord checks did not have his signature.  I know from my own review of bank records that most of the landlord and vendor checks that were deposited into SOOFER's accounts do not have any signature at all on the back of the check, but it is possible one or more of them had an impersonated signature.

            j.    I.F. also remembered issuing checks to Armed Elite Security, Revolution Kitchen, Catering Systems, and Wilshire Real Estate Services, among other vendors.

            k.    After she issued the checks, I.F. presented them to SOOFER for his signature, and he then took care of ensuring the landlords and vendors received them.  She was not aware SOOFER (or someone on his behalf) was depositing these checks into another one of his accounts.

            l.    I.F. believed the invoices she received from landlords and vendors had been mailed to the Abundant Blessings office.  She did not work out of the office every day, but the invoices were left on her desk for processing (she was not sure by whom).  She did not see any envelopes but assumed they had been mailed to Abundant Blessings.

            m.    I.F. was shown invoices supposedly from Revolution Kitchen that were attached to an email she sent to LAHSA Risk Management (discussed in more detail below).  She did not remember for sure, but thought, like the other invoices,

these had been mailed to Abundant Blessings.  She said she was
not aware the invoices were fake or fabricated.

       n.   According to email correspondence I.F. was shown,
I.F. communicated to LAHSA that there had been a mistake in the
original billing submitted to LAHSA and that they had not
received food from Revolution Kitchen that had been billed for
June 2024 (which was when LAHSA was investigating SOOFER for
failing to provide meals to participants).  I.F. wrote in the
email correspondence that "We have updated the reimbursement for
June to reflect this issue."  The email also stated: "As
requested I've attached the copy catering agreements for
Revolution Kitchen and Catering Systems for your reference."

       o.   I.F. reported that SOOFER told her Revolution
Kitchen had failed to deliver the meals they had contracted to
provide, and that she had conveyed this information to LAHSA.

       p.   I.F. was not aware the Revolution Kitchen
contract she provided to LAHSA was fake or fabricated.

       q.   I.F. was also involved in submitting
reimbursement requests to LAHSA for Abundant Blessings.  SOOFER
instructed her how to do this, and she also attended some online
LAHSA trainings.  She prepared reimbursement requests according
to SOOFER's instructions, and she submitted these requests for
SOOFER's approval through LAHSA's payment processing platform,
and following SOOFER's approval, they were routed to LAHSA for
payment.

       r.   I.F. was further involved in the accounting
reclassification project that Abundant Blessings was doing (at
SOOFER's direction) in response to the LAHSA monitoring efforts,

and she remembered this process taking a very long time and not being completed on the deadline LAHSA set.

s.    I.F. was not sure what happened with LAHSA's investigations or the outcome of the monitoring.  She was aware or believed Abundant Blessings ceased its operations in the fall of 2024, and she stopped working for SOOFER at that point.  She thought it was because the Abundant Blessings contracts were either not renewed or terminated or Abundant Blessings on its own had voluntarily stopped performing the services it had previously performed.  I.F. thought this might have been related to the failure to finalize the reclassification project on time.

t.    I.F. was in the hospital receiving radiation treatment for cancer when the FBI showed up at her residence on December 18, 2025.  These treatments impacted her memory, and they made her memory of that day in particular fuzzy.

u.    She originally remembered she had spoken only once with the FBI that day, but on review of her phone records after the meeting, she remembered she had spoken to the FBI twice that day, once for about five minutes around 10:30 am, and another time for about 10 minutes around 11:15 am.  Her memory was that the FBI asked her not to tell SOOFER about the FBI's inquiries on the second call only, and that she followed this instruction, but she did not remember this instruction from the first call, so after she spoke with the FBI the first time, she got in touch with SOOFER by phone on his cell number, referred to herein as SOOFER's phone.

v.    In the call I.F. had with SOOFER on December 18, 2025, she told him two FBI agents showed up at her house.

SOOFER asked if she was sure that it was the FBI (as compared to state or local investigators), and she told him she was sure.

       w.  She indicated she was worried federal agents were there to talk to her about her immigration status, and he said they might want to talk about Abundant Blessings. He offered to get an attorney for her, and he sent her contact information for that attorney. For reasons we did not discuss, I.F. decided not to use the attorney SOOFER had suggested, and she was instead represented by the FPD.

### G.   Financial Records Show SOOFER and his Family Were the Ones Profiting from the Fraud

28.  According to financial records and other documents:

       a.  SOOFER paid Abundant Blessings staff minimal wages (typically around $20-$30 an hour).

       b.  He paid himself and his wife annual salaries around $100,000, which is what he appears to have reported to taxing authorities as his income, but he diverted the rest of the money obtained through fraud for his and his family's benefit, using stolen money for extravagant expenditures.

         i.  For example, in June 2024, the same month participants at the Starlite and Antonio hotels were being fed Ramen noodles, beans, and breakfast bars, SOOFER and his family spent more than $100,000 on what appears to be personal expenses, including more than $47,000 in luxury home purchases (Restoration Hardware, Northern Saunas, Plantation Shutter, 3LM POOL & SPA INC, MEDIA HOME THEATER, INC., etc.), $15,000 at Hermes, $15,000 at Chanel, $1,000 for cosmetic dermatology, and $4,500 for a four-night stay at the Wynn Las Vegas.

ii.     The Wynn is a luxury resort in Las Vegas:



iii.    Hermes is a luxury retailer, and the luxury goods SOOFER and his wife purchased with taxpayer dollars include $910 for women's Chypre sandals with goat lining, $260 for a men's Faconnee tie, $1,250 for men's Paris calf-skin loafers, $455 for a men's Chevaux en Symetrie tie, and $2,450 for a men's trotting jacket:











iv.    Chanel is also a luxury retailer, whose website includes the following image.  Agents are investigating the Chanel retail items SOOFER purchased with public funds.



v.    In total, in the time period of the fraud, SOOFER and his family spent millions of dollars on personal expenses, including the downpayment on a $7 million house in Westwood, a $125,000 Range Rover, $475,000 for what appears to

be a vacation property in Greece, and millions more on travel
and entertainment, home renovations, and other living expenses.
The property SOOFER purchased in Westwood is located at 919
Hilts Avenue, Los Angeles, California:



        vi.    The property in Greece relates to a $475,000
check issued from an Abundant Blessings bank account and made
payable to an entity that appears to be a property developer in
Greece, DKG Development, whose website includes the following
images:



     vii.    All or nearly all of these expenses were paid with homeless housing money that was supposed to be used to feed and house the homeless.

     viii.    Photos of the food SOOFER was providing and conditions at some of his housing sites include:










c.    In the course of the scheme, SOOFER moved millions of dollars through bank accounts associated with other businesses in his and his wife's names.  In addition to the business names listed above, including Abundant Blessings from Above, Inc. ("ABFA"), Abundant Blessings, Inc. ("ABI"), FLC, and Prosperity Ventures No 1, LLC, businesses associated with SOOFER include: Raining Investments, LLC, Rivering Investments, LLC, Investments from Above, LLC, Investments from Abundant Blessings, LLC, YL SM 26 Inc., Los Angeles Public Health Medical Center, Highway Law Group, and The Lucky Lizard, LLC.

**H.    Interstate Wires Were Used to Execute the Scheme**

29.    According to documents and information from LAHSA and DocuSign, Inc. ("DocuSign"):[3]

a.    SOOFER signed contracts on behalf of Abundant Blessings using a DocuSign account in his name and linked to his email address.

b.    The contracts bearing SOOFER's signature include a contract to provide services to participants at the Antonio hotel and Starlite motel, signed on or about June 21, 2024.

c.    The contract was countersigned, using DocuSign, by LAHSA in Los Angeles.

---

[3] I know from my training and experience that DocuSign Inc. is a company that offers a software product called DocuSign, which is a service used by organizations and businesses to manage execution of contractual agreements and other documents with electronic signatures where the signatures can be verified using the internet protocol (IP) addresses and email addresses of the relevant DocuSign accounts.

d.    Investigators are obtaining additional information from DocuSign, but other evidence indicates SOOFER was also in Los Angeles when he signed this document.

i.    Among other evidence of SOOFER's whereabouts on June 21, 2024 are charges made on the AmEx credit card he was using for personal expenses, which were all made in the Los Angeles area, including a $4,400 charge at a stone supplier in Van Nuys, California, $3,696 at an auto repair shop in West Los Angeles, $4,777 at a plumbing supplier in Santa Monica, California, and $2 at a parking meter in Beverly Hills, California.

e.    All transactions executed from California through DocuSign involve interstate wires, as DocuSign does not maintain data centers in California.  Numerous additional interstate wires are under investigation.

## IV. CONCLUSION

30.  For all the reasons described above, I respectfully submit there is probable cause to believe SOOFER committed a violation of 18 U.S.C. § 1343 (wire fraud).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  21st  day of
January 2026.


_____
HON. ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE